ORIGINAL

FILED
JUN 10 1998
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ______
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

-- oOo --

BEFORE THE HONORABLE GARLAND E. BURRELL, JR., JUDGE

-- oOo --

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff,<br><br>Plaintiff,<br><br>vs.<br><br>THEODORE JOHN KACZYNSKI,<br><br>Defendant. | No. Cr. S-96-259 GEB |

-- oOo --

REPORTER'S TRANSCRIPT

MOTION TO UNSEAL DOCUMENTS

THURSDAY, MAY 28, 1998

-- oOo --

Reported by: SUSAN VAUGHAN, CSR No. 9673



570

A P P E A R A N C E S

For Plaintiff UNITED STATES OF AMERICA:

OFFICE OF THE U.S. ATTORNEY
650 Capitol Mall
Sacramento, CA 95814
BY: R. STEVEN LAPHAM
Special Attorney to the
United States Attorney General

For the Defendant:

OFFICE OF THE FEDERAL DEFENDER
801 "K" Street, Suite 1024
Sacramento, CA 95814
By: QUIN A. DENVIR
Federal Defender, Eastern District of California
JOHN P. BALAZS
Assistant Federal Defenders
Eastern District of California

For Media Intervenors the SAN FRANCISCO EXAMINER, CBS BROADCASTING and the SACRAMENTO BEE:

STEINHART & FALCONER
300 Capitol Mall, Suite 1700
333 Market St., Suite 3200
San Francisco, CA 94105
By: ROGER MYERS

-- oOo --

SACRAMENTO, CALIFORNIA

THURSDAY, MAY 26, 1998, 9:04 A.M.

-- oOo --

THE CLERK: Calling criminal case S-96-259, United States vs. Theodore Kaczynski.

THE COURT: Please state your appearances for the record.

MR. MYERS: Good morning, Your Honor. Roger Myers of Steinhart and Falconer appearing on behalf of the San Francisco Examiner, CBS Broadcasting and the Sacramento Bee.

THE COURT: Thank you.

MR. LAPHAM: Good morning, Your Honor. Steve Lapham for the United States.

THE COURT: Thank you.

MR. DENVIR: Good morning, Your Honor. Quin Denvir and John Balazs for Mr. Kaczynski, who is not present.

THE COURT: Thank you.

Does the United States take a position?

MR. LAPHAM: No, Your Honor. We're here just to answer any questions the Court may have.

THE COURT: Mr. Myers, I received a call, I believe, from your office yesterday. I personally didn't field the call, but my understanding is that your office wanted to know if I had a tentative ruling.

MR. MYERS: That's correct, Your Honor.

THE COURT: And I informed my staff to tell your staff no.

At that time I did have a tentative ruling on the First Amendment issue. However, it's my opinion I shouldn't have to reach that issue, and therefore I didn't give it then; I'm only inclined to give it now if you ask for it. I do have a tentative ruling on the common law issue which I just developed this morning, and I will give that to you before argument.

I will tell Mr. Kaczynski's counsel that this tentative ruling uses parts of the competency examination. However, I do not believe the parts that I am relying on are things that will bother Mr. Kaczynski's privacy concerns. I know you want to argue that issue, and I will give you an opportunity to argue it.

The media argues that they have a right to disclosure of the psychiatric competency report under both the First Amendment and common law right of access to judicial documents. Because I tentatively find that the media is entitled to access to nearly all of the report under the common law right of access, I do not think it is necessary to reach the constitutional issue. Indeed, the Ninth Circuit in Schlette recognized that "the common law right of access accomplishes many of the purposes served by the First Amendment." Accordingly, I recommend that you focus your

arguments on the common law access issue. I will give you my tentative thoughts right now.

The Ninth Circuit in Schlette states this common law "right to inspect and copy court records . . . is not absolute," is not "of constitutional dimension, nor is it given the same level of protection accorded constitutional rights." "But [the Ninth Circuit stated] it is also clear that the importance of public access to judicial documents and records cannot be belittled."

To demonstrate that the competency examination report should be made public under the common law right of media access, the media must "make some threshold showing that disclosure will serve the ends of justice." Schlette, 842 F.2d at 1581. If the threshold showing is made, then the determination of whether disclosure is warranted "requires the court to balance the need for disclosure against the reasons for confidentiality." The showing required for disclosure must be determined an a case-by-case basis and "will vary as the need for confidentiality varies." However, "if the reasons for maintaining confidentiality do not apply at all in a given case, or apply only to an insignificant degree, the party seeking disclosure should not be required to demonstrate a large compelling need." See Schlette at 842 F.2d 1581.

I find that under the rationale of Schlette, the media has made a threshold showing to practically all portions of

the psychiatric report, given the unusual facts of this case. Thus I am required, begin quote -- quoting from Schlette at 1581 -- "to balance the need for disclosure against the reasons for confidentiality." As observed in Schlette, "'confidentiality' is not some talismanic utterance that can justify a refusal to disclose contents of confidential documents when a sufficient showing supporting disclosure has been made." In the face of an adequate showing of need, the opponent of disclosure cannot rely solely on a general policy rationale as the basis for a continued sealing. Rather, the opponent must provide the Court with a basis to articulate specific, begin quote, "factual findings [justifying nondisclosure], which do not rely on hypotheses or conjecture." Hagestad, 49 F.3d at 1434 (9th Cir. 1995).

Clearly, "privacy concerns . . . may militate against disclosure in a given case." Schlette acknowledged that a third party's access to confidential documents could be denied where access would constitute "an unwarranted invasion of privacy."

Further, to accommodate legitimate privacy interests, courts have redacted legitimate material from confidential documents that was either of a personal nature or had no bearing on the interest justifying disclosure. See Valley Broadcasting, 798 F.2d at 1294, footnote 7.

This case was intensely followed by the media, which

argue that the psychiatric report was a critical document that led to the parties' stipulation on Kaczynski's competency to stand trial. The media further argue in their rely brief that access to the competency report is both "important for a full understanding of the competency decision" and of the "Unabomber himself".

In essence, the media argue that access will enable them to explain to a concerned public both the process by which the competency determination was made and what motivated the defendant to convict the crimes of which he was convicted.

The teaching in Schlette makes it pellucid that the media met its threshold burden here.

The newspaper in Schlette wanted to publish information that bore on the workings of the criminal justice system and argued that "the public is legitimately interested when a former public prosecutor is murdered by a felon whose conviction he obtained." 842 F.2d 1582-83.

The Ninth Circuit agreed that "making the public aware of how the criminal justice system functions surely serves the ends of justice." At 1583. The Court identified the "public interest" involved in that case as "particularly strong" because the felon had "vowed over a 30-year period to kill his prosecutor" and then shot "the prosecutor while out on probation." The public interest in the crimes of the Unabomber, which spanned nearly two decades, is much higher

than it was in Schlette.

But here, countervailing privacy interests are at stake that were not present in Schlette. The psychiatric competency report contains information about the defendant and third parties that is of a personal and sensitive nature. Legitimate privacy interests attach to this information. However, even where a legitimate privacy interest attaches to information, a balance of interests must be conducted to determine whether private interests are subordinate to the media's "legitimate interest" in obtaining information.

That balance tentatively reveals that the media is entitled to access all information contained in the psychiatric report which is directly relevant to the Court's determination of Kaczynski's competency to participate in the criminal proceedings, the parties' stipulation on his competency, and Kaczynski's motivation to engage in his terroristic crime spree, except for information having privacy concerns of third parties that militate against disclosure.

To focus your arguments on the common law right of access issues and to enable either party to agree or disagree with the scope of the release I tentatively contemplate, I will tell you the balance I reach and why.

The Ninth Circuit in Sacramento Bee, 656 F.2d at 482, mandates that a district judge should first seek a voluntary agreement with the press about the timing and scope of the

disclosure in question. I am hopeful that my statements of the redactions which I believe should be made will give you adequate information to agree or disagree with the proposed redactions.

First, I address the interests of third parties and explain the redactions I believe should be made on their behalf. The rationale for the redactions is in Valley Broadcasting Company, where the Ninth Circuit states that, begin quote, "courts have properly denied access when transmission of reproduced material would result in great public embarrassment of a third party." At 1294 footnote 7. Also, Schlette reveals that the district court "has supervisory powers over its records and files, and access has been denied where court files might have become vehicles for improper purposes." Further, courts may refuse "to permit their files to serve as reservoirs of libelous statements."

Here, while it is not certain that disclosure of information about third parties will embarrass or slander them, there is a sufficient potential for these effects to justify redactions. Moreover, these persons may well be unaware that information about them was provided and therefore have no ability to contest disclosure. Finally, the matters are not pertinent to the media's need for disclosure.

Accordingly, I have made the following tentative redactions. I recognize the media does not have a copy of the

competency report, but I think my explanation of what is redacted will provide the media with enough information to understand why I believe the matters should be redacted.

On page 5 of the report, I deleted part of a sentence involving third parties.

Well, that doesn't really tell the media enough information. I need to turn to the report.

(Pause in the proceeding.)

THE COURT: It concerns the medical history of other individuals, third parties.

A sentence was deleted on page 8 of the report involving third parties, which again I'll have to look at to see if further explanation can be made.

(Pause in the proceeding.)

THE COURT: It concerns a matter involving third parties that has no significance to the media's motion.

On page 14, I deleted five sentences from a paragraph which contains statements made by Kaczynski concerning his family.

On the same page, I deleted from another sentence the names of five women with whom Kaczynski purportedly had some type of relationship.

I have also deleted the names of third parties mentioned in the last paragraph on page 15. That paragraph continues on to page 16, where I have also deleted third party names.

I deleted the name of the third party referenced in the top portion of page 20.

I deleted one sentence that pertains to Kaczynski's brother on page 24.

I deleted part of a sentence on page 26 because it could be a libelous remark about a third party.

I deleted a woman's name from page 30.

On page 31 I deleted Kaczynski's comment concerning a third party that appears to have no bearing on the need for disclosure.

Part of a sentence is deleted on pages 33 and 36 because of how a third party is referenced.

Next, I address Kaczynski's privacy interests, asserted as a basis for non-access to the report. It is evident that some of the information contained in the report appears to be of a highly personal and sensitive nature. Kaczynski's obvious privacy interest in that information had some initial plausibility, but the privacy assertion cannot withstand close scrutiny. The report reveals that the most sensitive information relates to the same events in Kaczynski's life that culminated in his formulation of the intent to kill.

The key to this analysis is located on pages 16 and 17 of the report, where Dr. Johnson discusses something written by Kaczynski. And to assist the defense, I will tell you precisely what I am referencing.

Looking at the last paragraph on page 16, which carries over to page 17, this information "is [part of] a composite that [Dr. Johnson] obtained through review of the extensive writings completed by Mr. Kaczynski." See Forensic Evaluation at page 13.

On pages 16 and 17, Kaczynski sets forth a description of an experience that caused him to realize, begin quote, "he could kill someone," close quote. Although aspects of this experience and others that he described in his writings might be viewed as too personal to be disclosed if viewed in isolation, their connection with Kaczynski's realization that he could definitely kill causes all of the experiences he describes in his writings to be inextricably intertwined with criminal concepts involved in this case, such as intent and motive to kill.

Kaczynski's writings cited by Dr. Johnson were evidently written to explain to the public his identity as the Unabomber in the event of his capture. Therefore, this information was not part of any arguably confidential conversation he had with Dr. Johnson. Nothing in his writing indicates that reason and experience support recognition of his writing as legitimate privacy matters. To the contrary, Kaczynski's obvious intent was that such writings were intended to eventually be made public to explain his identity as the Unabomber.

Kaczynski's writings personify his Unabomber ideology

and, as Dr. Johnson states, begin quote, "were an effort to prevent the facts of his psychology from being misrepresented." Page 18 of the report.

Kaczynski's writings, which were written before his examination by Dr. Johnson, are such an intrinsic part of his identity that the report reveals at page 25 the following, begin quote: "The information he initially supplied in response to questions was frequently given verbatim from the information available in his voluminous writings. When pressed to expand on the issue, he presented some minor trouble in rewording his answer or in expanding or explaining it, but persisted with the examiner in an effort to accomplish the task," close quote. Forensic Examination at page 25.

These writings were made by Kaczynski under circumstances devoid of the confidentiality fundamental to an assertion of a significant privacy interest. As Schlette states, begin quote, "where . . . the reasons for maintaining confidentiality do not apply at all in a given case, or apply only to an insignificant degree, the parties seeking disclosure should not be required to demonstrate a large compelling need." 842 F.2d at 1581.

Since Kaczynski's writings were created solely by him to explain his identity as the Unabomber and were created apart from and prior to his competency examination, the public interest in accessing those aspects of his writings mentioned

in the report outweighs any privacy interest asserted by Kaczynski. Just as Kaczynski brought aspects of his writings into the competency examination to make points, he also gained national attention through some of his writings when he sought to force publication of them in exchange for killings to cease. He does not elevate the material contained in his writings to protectible privacy interests merely by discussing that material in a competency examination.

Dr. Johnson used his writings in the report and explains at page 18 of the report, begin quote, "Near the end of his autobiography in 1979, Mr. Kaczynski describes his motives for writing, to include that he intended to start killing people and that when caught, he was concerned people would perceive him to be a 'sickie.' " Forensic Evaluation at page 18. He wrote for the public, and I think the public is entitled to see the relation of his writings to the competency determination and his identity as the Unabomber.

For decades, Kaczynski wrote with a mind toward one day being discovered as the "Unabomber" and with knowledge that his writings would be made public. Accordingly, he used these writings to exhaustively explain his actions as those of a sane man. Kaczynski's writings form the crux of his identity as the "Unabomber," whose "ideals" Kaczynski sought to publicize. Having used his writings during the psychiatric competency examination, at times even verbatim, he cannot now

hide those writings from the public.

Further, because the content of those writings is of the same character and nature as other information he gave Dr. Johnson, his privacy interest in that information is diminished significantly.

In light of his use of his writings to explain both his identity as the Unabomber and his criminal motives, any privacy interest he has in such information pales in comparison to the public's interest to know his reasons in engaging in terroristic activities against society for years. For these reasons, his privacy interests have been significantly lessened and do not outweigh the media's interest in access to the report.

In conclusion, Kaczynski's reasons for maintaining confidentiality of the report apply to an insignificant degree because the information he claims to be private is either directly related to the competency determination, descriptive of his criminal conduct that is already part of the public record, or derived from writings that he intended to be made public.

Therefore, I am inclined to disclose all parts of Dr. Johnson's competency report except for matters I have already mentioned, namely: matters affecting the privacy of Kaczynski's family; the names and identifying information of third parties not before the Court who may not know the

context in which they have been included in the report and, therefore, the disclosure of such information appears to constitute an unwarranted invasion of their privacy; and any potentially libelous statements made by Kaczynski about third parties not before the Court who have no connection to the Unabomber crimes. For the stated reasons, the Court is tentatively inclined to file a redacted copy of the report immediately on the public docket.

It is up to you how you proceed from this point. I made some tentative comments when I took the bench, and that may very well prompt you to want to address other issues.

What is your preference?

MR. MYERS: Your Honor, speaking on behalf of the media, I am impressed with the level of thought and analysis that's gone into your tentative ruling. I agree with your legal analysis in full. It's difficult for me to stipulate to the redactions because, as you know, I have not seen the report so I don't know exactly what's being redacted, even though you have given us some explanation of that.

But I'm not going to argue that matter further, unless in response to something that the defense has to say, except to point out that I am a little bit concerned about the redaction at page 14 that I think there were five sentences that were redacted and, if I understood the Court, they were statements Kaczynski had made regarding his family.

THE COURT: That's correct.

MR. MYERS: And I would ask the Court to perhaps look at that one more time.

The rest of the redactions, to the extent I can tell from what the Court has said, seem to deal with third parties who are not before the Court, and I understand the Court's concerns in that regard. I can't stipulate to it because I haven't seen the report, but I won't argue them further at this point, except in response to something the defense might say.

THE COURT: The defense?

MR. DENVIR: Well, I hope that's a tentative decision. It sounds pretty long, but I'll give a shot at it anyway.

I think the Court is relying, it seems to me, exclusively on Schlette. And Schlette is quite different, as the Ninth Circuit noticed in that case, in two regards.

One is that there was no claim of privacy interests on behalf of the defendant in that case, Mr. Schlette, because those privacy interests were personal to the defendant and do not survive his death. That was one point that was made. And there was no evidence in that case that the privacy interests of anyone other than the dead defendant may be implicated by disclosure of the contents of the pre-sentence report and related documents.

So that was a case where there was no appearance by a

third party; there was no appearance by the defendant. The only one who appeared was a representative of the Government. And the Ninth Circuit concluded that there was no legitimate reason for preserving the secrecy of the Schlette pre-sentence report.

This case is quite different in that regard, and I think this presents a unique case.

First of all, you have a letter from the attorney for the Kaczynski family, who made very clear that the information that was provided to Dr. Johnson by the family they understood would only be used in open competency hearing if necessary.

THE COURT: Question. I don't know what information is referenced in that letter. Can you point to it?

MR. DENVIR: I'd have to go through the report. I was going to ask for the opportunity to point out to the Court what -- there's clearly information that the report reflects came from the Kaczynski family, as I recall. I have not reviewed the report recently. And their understanding was they were providing this information; it would not come out unless there was a need for a competency hearing in open court, in which case the report would come out.

That's what Mr. Bisceglie says in his letter. And he has not identified exactly the information in the report. We could certainly ask them to identify it.

THE COURT: How do we know that information isn't

already part of the public domain?

MR. DENVIR: Well, if it's referenced on, based on what they told them, I guess we'd have to check that out. But if Dr. Johnson's relying on what she told by the Kaczynski family during those particular interviews she had, it seems to me they'd still have a privacy interest in that.

Now, maybe we need Mr. Bisceglie to come out and deal with that, or the Kaczynskis to identify what information they provided to Dr. Johnson, or Dr. Johnson to provide that. I don't know. Some of it, it seems to me, was clearly -- and beyond what you referenced -- it was pretty clear it came from them.

THE COURT: Sir, as I understand my marching orders from the Ninth Circuit, I am required no make specific findings that would override the media's request for access. How could I make those findings based upon what you've just -- based upon the content of that letter?

MR. DENVIR: Well, you can give me the opportunity to go to the record and get the information from Mr. Bisceglie as to what exactly is information derived from the Kaczynskis in their interview with Dr. Johnson and then look at that.

All the question is, are their privacy rights which they're asserting, do they outweigh, as to the information they personally provided under this understanding, does that outweigh the media's need for that particular information?

And that particular information does not go to what the Court has talked about, the nature of the crime; it goes to the nature of Mr. Kaczynski and to his relationship with his family and his past history. They had no information about the nature of the Unabomber crimes; obviously they did not provide any of that to Dr. Johnson. What they gave was family history information. And that's what they say. And they feel that -- their understanding was that they were providing that to Dr. Johnson with the understanding that she would use it, if there was a need, for her own purposes, but would not use it in public; it would not be disclosed unless there was a need for a competency hearing.

And I think the other thing that I want to point out, too, and I think this is critical, Your Honor, is the nature of this case and how this all came about, because I think your analysis is incorrect in a number of ways.

One is -- the critical point here is Mr. Kaczynski did not ask for a competency examination. When he decided that he wanted to represent himself, the Court raised -- said, "Does this raise a competency matter?" And it was his counsel who said that they felt there was a need for a competency; the Court then appointed Mr. Clymo, or maybe Mr. Clymo was already appointed; you allowed Mr. Clymo to consult with Mr. Kaczynski; as I recall, it was put over or at least there was a delay, and Mr. Clymo came in and said, "Mr. Kaczynski

does not want a competency examination. He sees no reason for it at all." So this was not something that he sought.

THE COURT: No, those aren't the -- those aren't the -- I mean, we have a long history in this case. And I think you're confusing the facts giving rise to the competency hearing. What gave rise to the competency hearing is what you've just indicated -- yes, he did state he wanted to represent himself --

MR. DENVIR: Correct.

THE COURT: -- and then your co-counsel stated that because he could not endure the mental status defense, he wanted to represent himself; and then in the same context, or paragraph, your co-counsel then questioned Mr. Kaczynski's competency.

MR. DENVIR: No, that's not correct. I mean, and I cite --

THE COURT: Well, what difference does it make if that's correct or not?

MR. DENVIR: Well, because --

THE COURT: No. Just a moment.

MR. DENVIR: Okay.

THE COURT: You have already stated in your papers that Mr. Kaczynski objects to being sent to the psychiatrist. Okay. So that's fine. Let's start with that premise, and we don't have to deal with the other things you're talking about.

MR. DENVIR: Okay. But, in any case, this was not something he sought. And it was -- the Court ordered it and the Court ordered that he comply with -- that he cooperate with Dr. Johnson here, or otherwise he would have to be moved back to Butner. He promised you he would do that --

THE COURT: Okay.

MR. DENVIR: -- and he did that.

THE COURT: Okay.

MR. DENVIR: But what your analysis is -- you've said over and over again that Mr. Kaczynski used his documents in this examination. What he tried to do was, under the Court's order, was to comply with this. Now, at the time the Court had ordered that this report would be filed under seal.

THE COURT: Tell me the overall principle you're seeking to establish.

MR. DENVIR: The overall principle that I'm seeking to establish is that this case is much different than any of the cases you've looked at, and that --

THE COURT: But why?

MR. DENVIR: Because there is a privacy interest Mr. Kaczynski has that is much different than any of the cases you've looked at before, because he was ordered.

THE COURT: How does that deal with the principle I understand you to try to make, which is that I forced him to go to competency hearing, or to examination.

MR. DENVIR: Right. He gave --

THE COURT: Tell me how that aspect of it makes this case different from Schlette and the other cases, Valley case.

MR. DENVIR: Because Schlette was not ordered to go forward into an examination. Correct? He was not told that it would be sealed. He did not, in court, stipulate to the competency. His attorneys stipulated to the competency and to keep it sealed so there would be no report.

I mean, the whole idea of this, Your Honor, was there was concern, a legitimate concern as to his competency. The Court wanted an evaluation on that; we felt it was worthwhile. There was an evaluation at great length, done by a doctor way beyond anybody else who had seen him, who concluded he was competent.

Based on that, we stipulated. We removed that doubt about it. And one of the reasons was, we did not want this personal information being disclosed to the public. So he cooperated for the purposes of resolving your doubt as to the competency, and then when we saw the report we were satisfied that there was no competency question, and that's why we stipulated to it.

THE COURT: You had a doubt about his competency too.

MR. DENVIR: We had a doubt, but that was resolved by Dr. Johnson. We thought that at that point the Court should have a report resolving that question. We did, not Mr. -- you

recognized the difference between us and Mr. Kaczynski, because you asked that he be allowed, or you allowed him, to talk to Mr. Clymo, to see whether he joined in that. And he said he didn't want any examination; there was no reason to go forward. We felt there was. When we read the report at great length, we felt that that resolved the doubt, and that's why we stipulated to it, so that there would be no need for disclosure of the personal information that was in here. We felt that that resolved the doubt.

And when you say that his writings have been available in some form to the Government, the idea that he wanted all of them published is not true. It's also been revealed that he had a list of documents that were going to be destroyed if he had an opportunity to do it.

But in any case, the key thing is that this report came about because we felt the need to advise the Court of our doubt as to competency. He did not want to go forward with it. He cooperated under that compulsion, and then when the report came back we told you that we no longer had that doubt. We were satisfied based on what Dr. Johnson said. I feel that is much different, privacy type rights -- putting aside the Kaczynskis themselves, the family -- a much different situation than Schlette and those.

THE COURT: Are you arguing, in essence, that he had an expectation of privacy that was not present in the cases I

cited?

MR. DENVIR: Yes, Your Honor, because his expectation was that this would only be -- it's in effect the same one as the Kaczynski family had: that this would only be revealed to the public if it was necessary to have a competency hearing, and one of the reasons that we stipulated to that was because the original order said that the report would be filed under seal. We reviewed that and then determined that there was no need to go any further and we would stipulate, that we could then go forward and the Court could resolve the questions as to his Faretta rights, etc. That's exactly what we tried to do that morning, and the Court accepted it.

And there was a reason, was because we were concerned about these very things, about his having to disclose. He went forward, on our advice, to give this information. He did not want to give this information. He did not want to explore it with Dr. Johnson. We felt it was necessary, given the posture of the case and the Court's indication of what would happen if there was no cooperation, and with the jury waiting. He went forward on that basis. When we read the report -- and we felt that that resolved it; we didn't see that there was any -- that resolved our doubt, in that regard, as to the legal question. That's why we made the stipulation and that it would remain sealed.

So I think that is -- I think there was a reasonable

expectation of privacy in this case, this unique case, that is much different than Schlette, where the man had passed away, where it was a pre-sentence report -- and, actually, that doesn't explain what that is -- or any of the other cases that had been cited.

For instance, the case that they cited from Vermont, where evidently there was evidently a psychosexual report that was ordered unsealed on motion of the media -- the key point that is made in that case is that the defendant had received the report, reviewed the report and submitted the report, which is a much different -- again, that's a waiver type situation, when you then submit that -- they voluntarily submit it for their own purposes.

This was a case where Mr. Kaczynski was proceeding under compulsion of the Court's order, and I think that's --

THE COURT: He didn't know, though. I mean, Mr. Kaczynski did not know whether I would order a competency hearing or not. I don't have to accept the parties' -- I mean, the parties seem to think that I had to accept your stipulation. I didn't have to accept your stipulation on competence. And the order you're referencing -- you're right. I did indicate that, in a footnote, that the public had no presumptive right of access to the competency report.

But when I filed the competency report, I didn't file it with any statement saying the public had no access, right of

access to the competency report. What I did was I provisionally filed the competency report, because I knew that if a competency hearing was ordered or -- I knew it was already pending at that time -- if it was conducted, any aspect of the competency report that was made public during that hearing would be public.

MR. DENVIR: And that was our understanding. That is my understanding -- that's the Detroit News case -- that's my understanding: that if it is brought out in public in a competency hearing --

THE COURT: We're talking about two different things, though. We're really talking about First Amendment jurisprudence and common law jurisprudence, same time.

Under common law jurisprudence, the Ninth Circuit tells me that I've got to balance. I have to balance privacy rights against the public's interests. Under First Amendment jurisprudence, we would look to see whether or not the media prevails under the logic and experience test. I don't have to reach that issue. But that's what, when we start discussing whether the report is going to automatically be made public or is some aspect going to be made public during the competency, that's really what we're talking about.

But really what we should be focusing on, I guess, is your argument.

You were arguing that your client had an expectation of

privacy when he submitted to the competency examination, and that his counsel stipulated to his competency in order to apparently allow him to recognize that expectation of privacy --

MR. DENVIR: Right.

THE COURT: -- and that I should include that in the equation when I balance the rights of the parties.

MR. DENVIR: Right, that our understanding was, and whether you -- as I understand it, the common law right of access is more limited in the First Amendment; if there is a finding of the First Amendment right, there's less balancing in the First Amendment situation than there is in the other one.

THE COURT: Let's just talk about common law.

The media either has the right or doesn't have it -- it has a presumptive right to certain documents. And I think there's a debate amongst jurists as to whether this document is one of those documents. But I don't have to reach that issue.

MR. DENVIR: But the point I wanted to make is that it was our understanding that this report, this examination, was being conducted for the Court and the report was being prepared for the Court to be sealed; and that if there were competency proceedings, a hearing on that, where the doctor had to testify or something of that nature, the report then

would be made public; but that if the competency doubt which had been raised by counsel was resolved -- in this case by stipulation of counsel based on the report -- that it would not become public. That was the reason for stipulating, as opposed to just saying, "We'll release the report" or calling Dr. Johnson or anything of that nature. And it was our understanding that that would resolve the matter.

And I think that is a very important balance against the media's claim that they need this report, they have some right of access to it. I think that's the critical one in the privacy right.

And I think the other critical one -- and these are both totally different from Schlette. Where Schlette is, is there was nobody there representing the defendant or his family or any third party, I mean, and they made that point very clearly that the Government can't come up with any reason, any valid reason, and we're not talking here about the privacy rights of Mr. Schlette, because he's passed away and his rights died with him and there's no third party here at all. And this case is much different. There's much more to be weighed in the balance of it.

There's been a tremendous amount of information released about this particular case and the nature of the crimes. It's been released, of course, in the 404(b) motion. It's been released in the trial brief. It's been released in a very

extended statement of the factual basis for -- not only for the charged crimes but for all the uncharged crimes that went on for a long time with the change of plea. It's been covered in an extended sentencing memorandum and over, I guess, about 90 exhibits that the Government filed. It was covered by the victim statement, including some in uncharged crimes, including one not actually a victim, and in the Court's own statements at the time. It's been covered with a tremendous number of leaks of documents that have come out in the public domain somehow -- and they haven't come from this side; I'll tell that you much.

So I don't feel that there's any legitimate need for more information about the crimes in themselves beyond that. I don't think that the media's interest in that is that great. And the rest of it is extremely private information about Mr. Kaczynski that has not otherwise been made public that came out either through him or through writings of his that have not been released by the Court in any way or through his family. And those are the types of matters -- we feel that those privacy rights are really critical in this case.

And it's totally different than Schlette or any of those cases because of that particular fact that you've got privacy rights of a defendant who had a reasonable expectation that this would not be disclosed unless necessary to resolve the competency question, and it wasn't necessary; and then you

have the privacy rights of the family, who had the same expectation. Obviously, there was an understanding that this information, if necessary to resolve it in public, would be made public. I mean, there could be no hope that this could never ever come out if there was a need for a competency hearing. But we felt that, given the nature of the report and the conclusions in it, that resolved the question that we had raised and, as I say, one of the reasons that we stipulated was for this very purpose, that there wouldn't be dragging out into public all this private information about Mr. Kaczynski and his family.

So I think this is a much different case. And I don't know if the Court has really weighed in those -- as I think as you phrased it; I didn't phrased it that way, but I think you did -- in his what we believe are very reasonable expectations of privacy and those of his family, which I think outweigh the media's need for this information -- certainly as to any of the information about him personally and his history and things of that nature. And, as I said, the information as to the crimes is all information that's previously been out there. So there's nothing new in that regard.

As far as what the Court's proposing in the way of redactions, I really don't have an opportunity to -- I mean, I can't really react to them because it's still a little cryptic what they were, and we feel there would have to be much

greater redactions to accomplish that. We'd like an opportunity to submit that if the Court is going to release something. I mean, I'd like to get a copy of the Court's tentatively ruling and then go back and suggest to the Court what we would feel would come within that if the Court were to go forward.

But I think that this view that Mr. Kaczynski was using documents in the exam, that he was trying to do something, as if he had a purpose in the exam -- his only purpose, as he made clear, was to comply with the Court's order to go forward and do it in the most reasonable way so as not to jeopardize the jury, which he wanted to try the case in front of at that time and that he was prepared to go before this. We raised the competency question.

I don't know if the Court has any questions. I don't want to belabor the rest of this, if --

THE COURT: I understand your argument.

MR. DENVIR: Thank you.

MR. MYERS: Your Honor, if I may briefly.

THE COURT: You may.

MR. MYERS: It's clear, and this Court started to go down this road in its discussion with defense counsel, that there really was not a reasonable expectation of privacy at this point with respect to the competency report. There was a competency hearing scheduled. The parties, when they spoke

with Dr. Johnson, had to be under the understanding that it was likely that there would be a competency hearing in this case. There was no statement made on January 20th when the defense stipulated to the report that they were stipulating in order to keep any of this information private. They just stipulated that they were satisfied that it showed Mr. Kaczynski was competent to stand trial. That was the statement made on January 20th, and it's reflected in the reporter's transcript to that effect.

THE COURT: But he told me, though -- Mr. Denvir argued that there was some reliance on a footnote and an order I had issued earlier in which I stated the media had no presumptive right of access.

MR. MYERS: Under the First Amendment.

THE COURT: Right.

MR. MYERS: Reaching the First Amendment, but not the common law.

THE COURT: Correct. Correct. And he's also arguing that when Mr. Kaczynski was ordered to undergo a competency examination, he followed that order with the understanding that no aspect of the examination would be made public unless there was a competency hearing.

MR. MYERS: But that's not a reasonable expectation of privacy, because he knew there could well be a competency hearing ordered by this Court, even if the parties stipulated

to the findings of Dr. Johnson. So the purported reliance now on a footnote that said basically it will be filed provisionally under seal, which is what essentially your footnote said --

THE COURT: Well, the footnote didn't say that.

MR. MYERS: It just said under seal, but --

THE COURT: My order said that.

MR. MYERS: Right.

THE COURT: When I filed it, I provisionally sealed the order.

MR. MYERS: Correct.

THE COURT: Not the order, the docket --

MR. MYERS: The report.

THE COURT: The report. Right.

MR. MYERS: And it was understood by all the parties it could very well be a very public hearing on the competency issue, whether or not the parties stipulated to the findings of Dr. Johnson. So the purported expectation of privacy is really no expectation of privacy at all.

In fact, if you look at the letter from the attorney for the family that's attached to the opposition, they specifically say that their understanding was the information would be treated in a confidential manner and used only in court as part of the competency hearing. Well, that's tantamount to saying that they fully understood that

everything they told Dr. Johnson she could testify under direct or cross-examination during a competency hearing. So the family members really didn't have an expectation of privacy either. And that's something of a red herring, in fact. And there's no specifics given to support the kind of findings the Court would have to make under Schlette.

Furthermore, even if there was an expectation of privacy, the Court has pointed out that the public's need for access to the report outweighs any privacy interests that would be asserted by Kaczynski in this matter or that the family would assert as to information about Mr. Kaczynski that is pertinent to allowing the public to understand Mr. Kaczynski, the Unabomber's eighteen-year, as you put it, terrorist campaign, his motivations, the competency decision, and evaluations made by Dr. Johnson on which the competency decision in this case was largely based.

The stipulation was based entirely on that report. Defense counsel just admitted again. He said he thought the report resolved all doubt on competency, so we stipulated. That's what Mr. Denvir just said. That being the case, that demonstrates that the contemporaneous competency decision that was on January 20th was based entirely on Dr. Johnson's report. This Court then relied on Dr. Johnson's report when you issued your order respecting Mr. Kaczynski's competency. So there is a strong need for access to the report under the

common law that outweighs any privacy interests that might be asserted by Mr. Kaczynski or his family members with respect to any information they provided that bears on Mr. Kaczynski or his crimes.

I'll also point out, Your Honor, that if you accept the defense's arguments, that compels you to go on to the First Amendment issue. If you were to accept their arguments that the privacy interests here somehow outweigh the common law right of access, that would compel you to go to the next step and do the First Amendment analysis as to whether or not a right attaches and, if so, whether or not there is compelling interest that can overcome that right.

I'm not going to argue that at this point unless the Court indicates some desire for further argument on that or if you're inclined to accept Mr. Denvir's arguments. I think then you have to go on to the First Amendment analysis.

But if you're not, if you're going to stand by your tentative analysis, then I don't think there's need to address the First Amendment point.

THE COURT: Well, I'm not going to rule from the bench. I'm going to consider his arguments and think about those arguments in the quiet of my chambers and probably issue a written opinion.

But I do want you to address one thing he stated. Mr. Denvir has asked for an opportunity to make further

redactions beyond what the Court has indicated. What's your position?

MR. MYERS: I don't think that's proper, for a couple of reasons. Number one, the Court continued this hearing at the request of the defense to give it additional time to file an opposition. Any arguments it wanted to make and any documents it wanted to file under seal as to explain exactly what it thought really needed to be kept confidential here, it had the opportunity already to do so and did not take advantage of it. That's also true of the family members.

Point two, even though Grove Press [phonetic] is a First Amendment case, the point applies that if a right of access attaches to a document, the access should be as contemporaneous as possible and should not be delayed.

Point three, nothing that he has argued overcomes -- even assuming that there is a reasonable expectation of privacy here, which I don't think he's shown -- even assuming that, the Court's analysis as to why there's a public interest in access to the information concerning Mr. Kaczynski outweighs any further need for redaction, outweighs any privacy interests.

So I don't think that access should be further delayed to allow the defense to file, in essence, what will be, no doubt, a heavily redacted copy of a competency report. That will just result in further argument. And I would ask to be

allowed to address that point in chambers if we ever got that far to address the redactions that they would be proposing.

Beyond that, let me just touch briefly on the First Amendment issue, because if you're inclined to do heavy redaction or seal the report entirely on the common law analysis, we have to touch on the First Amendment.

THE COURT: I don't think you have a First Amendment right of access.

MR. MYERS: And what's the basis for that, Your Honor, briefly?

THE COURT: I have a tentative ruling on that and I'll give it to you.

MR. MYERS: Okay.

THE COURT: A two-part test is involved, commonly referenced as the experience and logic test. United States Supreme Court states in Press-Enterprise II at 478 U.S. page 9, if a "particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of access attaches."

Under the experience prong of the inquiry, the Court asks whether the report, in light of its use in the proceedings, has been historically open to the public.

The Supreme Court in Globe Newspapers reveals that when answering this question, a court should determine whether or not the nation's experience implies a judgment which favors

public access to the report. You, on behalf of your clients, reveal in your opening brief at page 6, lines 2 to 4, "The experience test of Globe Newspapers does not look to the particular practice of any one jurisdiction but instead to the experience in that type or kind of [use] throughout the United States." And you cite a Supreme Court case for that proposition.

And you further state on the same page that "the experience 'throughout the United States' reveals a history of public access to competency hearings and records filed regarding those hearings." You cite the State case of Times-World, 488 S.E.2d at 681, for that proposition.

But we are not dealing with access to a competency hearing or records filed at competency hearings when we talk about the report in question. Our question centers on whether a right of access attaches to a competency report which obviated the need for competency hearing.

The cases involving public access to such reports have not taken a uniform approach. Some courts have sealed psychiatric competency reports, making public only those portions disclosed at competency hearings or in judicial competency findings. My orders concerning the sealing of the competency report reflect the rationale of these cases. In my order of January 9, 1998, I stated the report would be filed under seal, in recognition that the public had no immediate

right of access to the report.

But when I actually received the report, I only provisionally sealed the report -- see my January 20, 1998 order -- because I recognized that aspects of the report cited or used during the then-pending competency hearing, would be made public.

The parties rely on divergent authority in support of their conflicting views on what the experience throughout the United States shows regarding making public those aspects of sealed psychiatric reports which are not made public in a judicial finding on competence or during a competency hearing.

The movants rely heavily on Express News Corporation, a Texas Court of Appeals decision for the proposition that the national experience has been to make psychiatric competency reports public even when no competency hearing has been held. That case found the right of access applied to a psychiatric report that never became part of the criminal case.

The media also suggests that In Re Times, a Virginia State Appellate decision, supports the same proposition. That case, however, by a citation to the Atkins Michigan Supreme Court decision, see Atkins at 514 N.W.2d 148, appears to recognize the divergent judicial opinions on the matter. It recognized that Atkins found there was no qualified right of access to a criminal competency report that was not

admitted into evidence.

Kaczynski counters that notwithstanding the express news decision and the other cases cited by the media, "it is clear that psychiatric competency reports have traditionally been treated as confidential, except as disclosed in a formal competency hearing." Kaczynski cites several cases in support of his position, including Atkins, where the Supreme Court of Michigan stated, "Competency reports that have not been admitted into evidence have traditionally been viewed as confidential in [the State of] Michigan and that public access would not play a significant positive role in the functioning of the particular process in question."

On the same point, the decision in Detroit News, which was affirmed in Atkins, stated, "There is no right of access to the competency report prepared pursuant to defendant's request for a competency hearing. [We] believe that a competency report usually has been considered to be confidential, i.e., not accessible by the general public, except to the extent that the report or portions of the report are placed on the court record."

Analysis of the authority cited by the parties reveals that the media's contention that the experience throughout the United States allows public access to the competency report in question is not substantially supported to justify the media's conclusion. In fact, other jurists appear to have handled the

matter similar to the way I did in this case. Thus, the media has not demonstrated to my satisfaction a historical tradition of access to the psychiatric competency report.

The media has likewise failed to show that logic favors disclosure. Atkins pointedly states that the public access would not play a significant role in the function of the competency process in question. As the Ninth Circuit states in Stone vs. United States, 358 F.2d at 506 (1966), this process "is non-adversary in character, unless and until the psychiatric report reveals a psychiatric condition which calls for a hearing and examination by the Court of the [defendant's] competence," close quote. The process is designed to furnish the Court with information concerning a defendant pertinent to the competency determination.

It is conceivable that even an innocent person could be suspected of being incompetent to stand trial and thus forced to undergo this process because of his or her failure to view the Government's case from what could be viewed by some as a realistic perspective.

Frankly, I had such a case, sir. I had a case involving a defendant accused of bank robbery. One would think that if a person is accused of bank robbery, there's strong evidence against the individual -- they usually take films of people who go in and rob banks; there's other ways to identify such individuals -- the defendant's lawyer would stand in my

courtroom and look at the defendant and shake his head in disbelief that the defendant thought he could beat the charges. I had another case involving a defendant who also claimed that she was innocent. That lawyer for her also shook his head in disbelief. She was sent for a competency examination for a psychiatric report. She was later found guilty. The defendant in the bank robbery case was found to have been wrongly charged. And so if he had then submitted to a competency examination, all of the private information about his past would have been made public, if the media's correct in its argument that it has a presumptive right of access, because that psychiatric report would have been filed. And despite the presumption of innocence which attaches to every criminal defendant, that defendant would have been dragged into this courtroom, wrongly charged as he was, because later the F.B.I. looked at his alibi and found out he was telling the truth and the Government dismissed the charges against him. There's something that I find inherently unfair about a system that would take an innocent, a possibly innocent person, bring them into the courtroom, have them undergo a psychiatric examination and then make it public for everyone to see. It seems that perhaps that's why the common law right of access doctrine has some meaning, so a court can balance the various interests involved.

Detroit News explained the potential harm of public

disclosure and its reasoning as follows. "The possibility that the entire contents of a competency report, including those portions not dealing with competency itself, could be disseminated to the public at large would seriously undermine the process. A defendant without the guarantee of confidentiality might be reluctant to speak candidly with the examining psychiatrist. In certain situations, defendant might even choose not to raise the issue of competency and forgo a competency evaluation to avoid public disclosure. In either situation, the flow of necessary information to the examining psychiatrist and ultimately to the court would be hindered by unrestricted access to competency reports."

The Court in Miller vs. United States, 207 F. Supp. at 7 and 8, also evinces that the logic test does not favor a qualified First Amendment right of access as follows: "In consideration of such course of events as has been outlined here with reference to Miller, this Court has directed in all such cases, as was done in his cases, that the psychiatric report be made a formal part of the court record. The Court also provides in such cases -- and it was done here -- that after full and careful consideration by the report, the report be filed with the clerk, that it be sealed, and that it be open only upon an order of a court of competent jurisdiction.

"This last provision is made because almost invariably the psychiatric report contains extremely personal data about

the defendant, sometimes the defendant's own self-analysis of the inner workings of his psyche, perhaps comments about members of his family and associates, his childhood experiences, sexually liaisons, etc., all I which to this Court the impropriety of broadcasting to the world at large such intimate revelations or speculations."

Miller and Detroit News bespeak that without guaranteeing a criminal defendant that his statements in connection with a competency proceeding be kept confidential unless and until the statements become pertinent to a competency determination or hearing, defendants and others might be reluctant to speak candidly with the examining psychiatrist. This reluctance could undermine the competency evaluation process, which would be antithetical to the paramount societal interest of ensuring that criminal proceedings are not conducted against a mentally incompetent defendant.

For these reasons I doubt that you will be able to convince me that there is a presumptive right of access to the competency report. But I think that you have a very strong argument under the common law.

MR. MYERS: I will only, then, briefly address the First Amendment issue. The Detroit News case is directly in conflict with Ninth Circuit precedent.

THE COURT: Oh, I disagree with you. Just a moment. I

didn't share that part of my analysis. I have looked at all of the Ninth Circuit precedent you cite. I had to do that in connection with this case.

MR. MYERS: Right.

THE COURT: And none of those cases deal with a competency report. You were taking language set forth in those opinions out of context. In my opinion -- of course, everything I say to the Ninth Circuit is a recommendation; the Ninth Circuit may very well disagree with me -- but in my opinion, nothing in any of those opinions supports your position on a presumptive right of access to a competency report.

MR. MYERS: Well, if you look at the Corbitt case -- which is the Seventh Circuit case on which the Detroit News relied for its test to determine whether a right of access applies to the competency report -- the Corbitt case in footnote 4 specifically acknowledged that its test was in direct conflict with the Ninth Circuit's test articulated in Associated Press and Seattle Times.

THE COURT: I disagree with that analysis.

MR. MYERS: Well, that's the Seventh Circuit explaining that its own test is inconsistent with the Ninth Circuit.

THE COURT: You disagree with the Seventh Circuit when it criticizes the Ninth Circuit in Schlette.

MR. MYERS: Well, I'm not disagreeing with the Court --

THE COURT: Sir, I think you need to make your arguments to the circuit. You're not going to convince me that you have a presumptive right of access under the First Amendment. You're just not going to convince me. I don't believe either the logic or the experience test supports you.

MR. MYERS: All right. Well, I will just close on at that point by saying that the Ninth Circuit authority that we relied on, as recognized by the Seventh Circuit that the Seventh Circuit relied on, says that the analysis for access to records turns on whether or not there is a right of access to the proceedings with respect to which the records were filed. And I think that has to be the analysis.

I will also point out briefly that in Globe Newspapers, footnote 13, the Supreme Court specifically addressed the issue of whether the privacy concerns raised by having minor sexual assault victims testify in court warranted a complete ban on access, and the Court said it did not but that was a factor that had to be -- that that could not justify wholesale closure of that portion of a testimony involving the minor sex victim's testimony. That did not go to whether or not the right of access attached; it went to whether or not the right of access could be overcome.

THE COURT: It's a different issue, clearly.

MR. MYERS: I'm just talking about the privacy issues.

THE COURT: Yes, but the public -- even when privacy

issues are involved, the public has an absolute right unless the Court satisfies closure jurisprudence to attend hearings. And you can have a hearing where there are sealed documents involved with the hearing. The public has a right to be there. And the access of those documents that become public during those proceedings become public.

MR. MYERS: I guess we will have to respectfully disagree on this point. I think that the Ninth Circuit's analysis as to whether or not a right of access attaches to documents turns on whether or not a right of access attaches to the proceedings in connection with which the documents are filed.

THE COURT: I know that's your position.

MR. MYERS: And I recognize that you disagree with that.

But we -- on the common law issue, we agree with your legal analysis. We would respectfully request that the Court not further delay release of the document to allow the defense to file further motions or documents with respect to sealing or further redaction of the report.

THE COURT: I understand that.

MR. MYERS: Thank you.

THE COURT: Go ahead, sir. Why isn't he correct on that, Mr. Denvir?

MR. DENVIR: On which part, Your Honor?

THE COURT: Well, he basically is telling me that the

defense has had an opportunity to request redactions. And you didn't request them before this hearing. And what the media's telling me is that I shouldn't continue this matter further; I should decide the issue; I should assume that you have been provided ample opportunity to give me all the information in connection with this hearing and now I should reach a decision.

MR. DENVIR: Well, Your Honor, the media suggested this could be done in camera with a sealed filing. Our experience in this has been that anytime anything is submitted that someone -- that there's no such thing as a sealed filing that could be -- remain filed. We did not feel that we were in a position to do that or that we should do that until the Court had given us an indication as to how it was going to proceed on either of the two, either the First Amendment or common law issue.

If the Court is not inclined to let us suggest redactions, or Mr. Bisceglie on behalf of the Kaczynskis, I would ask the Court to consider this. In weighing the media's interests in release of this information versus the privacy interests of Mr. Kaczynski or his family, I think the Court can make a distinction between information that goes to the Unabom crimes versus information about Mr. Kaczynski and his family. I think that the media may have a greater interest in information about the crimes themselves, and Mr. Kaczynski may

have a lesser right of privacy as to those; on the other hand, as to the items that just merely go to his own personal history, his private matters, his family's private matters, it seems to me that they have much less of a legitimate interest -- they may have an interest, but I don't think it has any great legitimacy, and he has a much greater right of privacy as to those.

If the Court -- we could suggest to the Court a way to do that, or the Court could itself. You say it's a weighing, and it undoubtedly is; it's a weighing of their legitimate interests versus his legitimate interests, or his family's. And I think the Court, in making that weighing, could treat these two different areas very differently and could find that there was a greater media interest and a lesser privacy interest as to the Unabom crimes that would justify disclosure; on the other hand, as to his growing up, all the things that the Court knows is in there, his relations with his family, his whole history, none of which is tied to the crimes, that the media has much less of an interest, a legitimate interest in that, and he has a much greater right of privacy and a legitimate one.

Counsel seemed to suggest that there was no basis for our suggestion that in stipulating, one of the reasons we were doing that was for this very purpose, that these private matters would not be released. And I wanted, if I could, to

just go over what was said on the 20th. It was Tuesday, the 20th. The hearing was set for the 22nd.

You said, "The hearing has been scheduled to cover the competency report, the forensic evaluation performed by Dr. Sally Johnson. Are we ready to cover that?" I replied, "Yes, Your Honor."

You asked, "How do you recommend covering it?" I replied, "Well, Your Honor, we were provided a copy of the 47-page report and the cover letter on Sunday. Counsel have reviewed it. We have provided a copy to Mr. Kaczynski, and I believe that we are prepared to stipulate at this time that he is competent to stand trial based upon that report. As far as the report itself, we would ask the Court to release the cover letter but to keep the remainder of the report sealed under the authority of the court previously cited. So I believe that, then, would take care of the competency matter." Mr. Cleary: "We join in the defense request to file the cover letter and seal the report itself, Your Honor."

Another point; we went on.

You then said, "Let's go back to the competency report. First, I'm going to tell Dr. Johnson she's not needed for Thursday. And by virtue of your stipulation, I assume you don't contemplate the Court making any findings." Mr. Cleary: "That's correct, Your Honor." Mr. Denvir: "That's correct, Your Honor."

I just want to say that I think what I've just read reflects exactly what I told the Court, which was that one of our purposes, if not the main purpose, of stipulating was to keep these matters away from the press and to resolve the competency matter with the report being sealed.

Counsel questioned that; I think it's supported by what was in there.

THE COURT: I feel that the Schlette case is precedent that strongly favors the media's request. I indicated a tentative ruling. I listened to your argument. But I'm not convinced by your argument that under Schlette I can do anything other than release vast portions of the report.

I'm just telling you that so you know what I'm thinking before I leave the bench.

MR. DENVIR: Right. But the only thing is, Schlette says that the media had an interest in those reports and said there was nothing to be weighed on the other side; there was nothing to be weighed. There was nothing being raised by the defendant or by third parties.

So, I mean, it was kind of a sure thing at that point that it would be released, it seems to me, in a balancing. This is much different, because we do have, I believe, reasonable expectations of -- and the Ninth Circuit was very clear that there was no privacy interest on Mr. Schlette's part because he was deceased and that there was no third party

claiming that.

So in some ways, that balanced it that way. We think it balances much more easily when you've got legitimate interests of both Mr. Kaczynski and his family. So I think it's quite different than Schlette. The analysis is the same, but the actual weighing, what goes on the scales, seems to me to be much different. That's what we asked the Court to reconsider and, particularly, to reconsider it in terms of the release of the report, those portions that had to do with the crimes versus those portions that had to do with private matters of Mr. Kaczynski and his family and their history prior to the crimes.

I think the Court should weigh those, and can and should weigh those differently, as I say. I think the legitimate interest of the media is much less in private matters about Mr. Kaczynski and his upbringing and his family than it may be in parts of the report having to do with the crimes themselves. And I think, again, his privacy, reasonable privacy rights in those particular personal matters are much greater than they may be on the crimes themselves.

So if the Court's going to weigh, we would ask you to reweigh and maybe to reweigh different parts differently, and then maybe any disclosure should be based on that weighing.

Thank you, Your Honor.

THE COURT: Anything further?

MR. MYERS: Briefly, on the last point, Your Honor.

As the Court's tentative ruling indicated, Mr. Kaczynski's motivations are a matter of legitimate public concern. And the information concerning him that may not necessarily bear directly on the crimes he committed but might explain why he did what he did weigh strongly in the balance in favor of access, as the Court's indicated in his tentative ruling.

As Mr. Kaczynski said in his own sentencing hearing, the public should not judge him until all the facts about him and the case are out. And we're just asking that the facts in the competency report be released so that the public can know more about Mr. Kaczynski, his motivations and his crimes.

THE COURT: Before you say something, Mr. Denvir -- I know you want to talk -- under the Ninth Circuit case of Sacramento Bee, I'm required to communicate with the media's representative as I'm now doing.

Can you pointedly address Mr. Denvir's argument concerning the family? He's indicating -- in essence, perhaps he's acquiescing in aspects of my tentative ruling because he understands I may not change my mind, and so he is suggesting that he recognizes the Court may very well release matters pertaining to the crimes, but he wants me to go back and rebalance matters pertaining to Kaczynski's family.

Can you give me input on that? How interested is the

media on that point? My inclination is to go back and look at the report and conduct another balance, looking at whether I have missed something concerning family privacy matters.

MR. MYERS: As the tentative ruling indicated, the interest that the public has about this case is not limited to why Mr. Kaczynski -- or the crimes that Mr. Kaczynski committed. They extend to the reasons for Dr. Johnson's evaluation and finding that Mr. Kaczynski was competent to stand trial. And many of the facts, I presume, that Mr. Denvir is talking about bear directly or perhaps indirectly on that issue. And therefore there is a strong common law right of access to those parts of the report even dealing with family history that bear on Mr. Kaczynski's competency.

Second, there is a strong common law right of interest to those facts to the extent that they bear on Mr. Kaczynski's motivations, his thoughts as to why he did what did, what made Mr. Kaczynski the Unabomber -- and it seems, without having read the report, it seems that family history would be directly relevant to that. And I think that there is a strong, strong public interest in understanding how this happened, in addition to the public interest in understanding the competency evaluation and other aspects of Mr. Kaczynski and his crimes. So I would say that even if you rebalance, the balance would have to come out the same.

In addition to that, I'll go back to the point: I do not think that there was a reasonable expectation of privacy here. There was a competency hearing scheduled. It could very likely have taken place. The competency report could well have been admitted into evidence at that hearing. Dr. Johnson would have testified under direct and cross-examination and could have been asked about and testified about anything that she was told and put in her report. So to the extent that any of this information is reflected in the report, I do not believe that there is a reasonable expectation of privacy. That is borne out by the letter from the attorney for the family, in which they understood everything that they told Dr. Johnson could be revealed in open court during the competency hearing. In that circumstance, I don't think there's a reasonable expectation of privacy.

And one other point on Schlette. The psychiatric report that was submitted in that case -- there's no indication that, you know, it was voluntarily submitted by the defendant. It's much more likely that the probation department decided it wanted a psychiatric report on Mr. Schlette and did one. So it wasn't a situation that the defendant voluntarily said, "I want to submit a psychiatric report." So you just can't distinguish Schlette on the ground that in that case it was somehow voluntary and in this case it was not.

I recognize that in the Schlette case the defendant was dead by the time the issue of access to the report came before the Ninth Circuit or even the district court. But the distinction between the psychiatric report in that case and the competency report in this case, as one being voluntary and one not, is just not accurate.

I don't know if I've addressed the Court's concerns in that regard. I'd be happy to answer any other questions.

THE COURT: You've responded to my questions.

Mr. Denvir.

MR. DENVIR: Just a couple of points there.

One is, as far as Schlette is concerned, there is nothing to indicate that was done under order of the court. In fact, as I recall, the psychiatric report was part of the probation report. He was granted probation. Presumably that was given by the defendant in order to get probation. This case is much different than that.

But what counsel says over and over again is that there was no reasonable expectation of privacy because there could have always been a competency hearing. We understand that. Our point is that there was a reasonable expectation of privacy, a conditional reasonable expectation of privacy that it wouldn't be released unless there were a competency hearing, a need for it. And as I say, a stipulation was meant to avoid that need. So to quote Mr. Bisceglie saying that it

wouldn't come out unless there was a hearing again supports what we've been saying was the understanding of both Mr. Kaczynski and his family.

As far as Mr. Kaczynski's statement's at the time of sentencing asking that people keep an open mind until all the facts came out, as the Court is aware, that was in response to the Government's sentencing memorandum, which had nothing to do with his private life, which had to do with the question of the crimes. So I don't know if this is supposed to be a waiver or what, but it's just strictly irrelevant.

And finally, if the Court is to issue an order, we would ask two things. One is that Schlette provided that the media be allowed to examine whatever was released and make notes but not copy it. That's the nature of Schlette. We would ask that the Court follow that also. And also, if the Court would, we would ask the Court stay that release for 10 days after its order, so we can confer with Mr. Kaczynski and with Mr. Bisceglie, the attorney for the Kaczynski family, to see whether there will be an appeal, and then if there were we would then seek a further stay and then file appropriate papers.

THE COURT: Response to the stay request? Well, actually you've said two things. Response to both things?

MR. MYERS: With respect to not allowing the media to copy the report, I recognize that is what Schlette said. I

also recognize that as the Court said in its tentative ruling that the public interest in access here is much greater than in Schlette. There's also 47 pages here, where I suspect that whatever was at issue in Schlette, the psychiatric report, the probation report, were probably substantially less than that; it would have been a lot easier to take notes on it. So I would ask that the Court make the document available for copying as it's been redacted, after it's been redacted by the Court pursuant to the tentative ruling.

On the stay request -- I think 10 days is a long time for them to confer with their client. I recognize he's not here. I also recognize that there is a supposed cat out of the bag argument. On the other hand, this matter was continued at the defense's request. It would seem to me that they had time to confer with their client to decide whether, if this Court's ruling was going to be to release some or all of the report, whether or not they were going to appeal that ruling, could have had that decision at least tentatively made by the time of the hearing today. And, given the strong public interest in access that supports the common law right of access, and given the case as recognizing that where access is appropriate it should be as contemporaneous and quick and immediate as possible, I would request that the Court either deny the stay request or limit it to three days at the most.

MR. DENVIR: I think that's unrealistic, Your Honor. I

mean, counsel can say that we should have conferred with Mr. Bisceglie, find out what his clients think -- well, he's in Washington --

THE COURT: I'm not going to deny your request for a stay, but I am wondering if you need 10 days.

MR. DENVIR: Well, we need time, Your Honor, because Mr. Kaczynski is in ADX in Florence. We need an opportunity when the Court rules, first, what was the basis for the Court's ruling for him; and then what exactly is being released, and have an opportunity to go over that with them. We have to do the same with Mr. Bisceglie in Washington, who will need to contact his clients in New York. So I think we would need at least a week or longer. Three days is just simply not enough time. It forces us to file an appeal and file to seek a stay before we have a chance to confer with our clients.

THE COURT: Are you indicating that seven days could possibly be sufficient?

MR. DENVIR: It seems to me we should be able to, if we get the order and get it to the clients and Mr. Bisceglie.

THE COURT: What you contemplate, then, is that I would file an order, and attached to your copy of the order would be a redacted form of the psychiatric competency report; I wouldn't make that public, and I would tell you if there would be public disclosure of the report, it would be stayed for

seven days.

MR. DENVIR: And then in the interim, if we wanted to appeal it, we would file a notice of appeal and seek further stay.

That would be satisfactory. I hadn't thought about the mechanics, but that seems to me that would do it.

THE COURT: Are the mechanics that I explained acceptable?

MR. MYERS: To the media?

THE COURT: Yes.

MR. MYERS: Would the further stay be sought in this court or the Ninth Circuit?

MR. DENVIR: We would have to seek it in this court first.

MYERS: Yes, I guess, as long as we have adequate notice on the motion for a further stay, if there is one.

THE COURT: I think we've covered everything. Thank you.

MR. DENVIR: Thank you, Your Honor.

MR. MYERS: Thank you, Your Honor.

(Time noted: 10:37 a.m.)

-- oOo --

REPORTER'S CERTIFICATE

-- oOo --

STATE OF CALIFORNIA )
) ss.
COUNTY OF SACRAMENTO )

I, SUSAN VAUGHAN, certify that I was the official Court Reporter and that I reported verbatim in shorthand writing the foregoing proceedings; that I thereafter caused my shorthand writing to be reduced to typewriting; and that the pages numbered 1 through 59, inclusive, constitute a complete, true and correct record of said proceedings:

COURT: U.S. District Court
Eastern District of California

JUDGE: Honorable GARLAND E. BURRELL, JR., Judge

CAUSE: U.S. vs. Theodore Kaczynski
Case No. Cr. S-96-259 GEB

DATE: THURSDAY, MAY 28, 1993

IN WITNESS WHEREOF, I have subscribed this certificate at Sacramento, California, on the 8th day of June, 1998.

Susan Vaughan

SUSAN VAUGHAN, CSR No. 9673